664 So.2d 917 (1995)
Edwin H. KEWISH
v.
ALABAMA HOME BUILDERS SELF INSURERS FUND, et al.
AV93000618.
Court of Civil Appeals of Alabama.
March 3, 1995.
Rehearing Denied April 7, 1995.
Certiorari Denied June 30, 1995.
*919 Robert W. Lee, Jr. of Lee & Sullivan, P.C., Birmingham, for appellant.
Tom Burgess and Thomas S. Hale of London, Yancey, Elliott & Burgess, Birmingham, for appellees.
Alabama Supreme Court 1941048.
THIGPEN, Judge.
This is a workmen's compensation case.
In August 1992, Alabama Home Builders Self Insurers Fund, et al. (Fund), filed a complaint for declaratory judgment, seeking a declaration of its obligations in relation to an injury claimed by Edwin H. Kewish. The Fund is the insurance provider for Vulcan Plumbing & Heating Company, Inc. (Vulcan). The Fund alleged that Kewish was an employee of Vulcan, and that he gave notice of an on-the-job injury on or about July 20, 1992. The Fund asserted that a controversy existed regarding whether Kewish's injuries were sustained while acting in the line and scope of his employment. Kewish answered, denying that a controversy existed and counterclaiming for workmen's compensation benefits by alleging that he was injured on July 20, 1992, while engaged in the line and scope of his employment.
Following ore tenus proceedings, the trial court made these findings:
"[E]ven taking the evidence in the light most favorable to Mr. Kewish, the Court finds that the Defendant, Edwin H. Kewish, had deviated from the course of his employment at the time of the accident which caused his injuries. The accident occurred at a location which was neither going to nor coming from an area in which Mr. Kewish had reason to be in the course of his employment nor was it an area in which he might have been taking a short cut from one location to another."
Before denying any benefits to Kewish, the trial court concluded that the injuries sustained by Kewish "did not arise out of and were not sustained in the course of his employment." Kewish appeals from the judgment denying benefits on his workmen's compensation claim.
The only issue on appeal is whether the trial court erred in determining that Kewish's injuries did not arise out of, and were not sustained in, the course of his employment with Vulcan.
*920 The record on appeal includes numerous and massive trial exhibits, including detailed maps, surveys, large still photographs, and video footage of the accident scene, together with significant testimony regarding or in connection with these exhibits. The record discloses that the witnesses often physically indicated to the trial court specific points on these exhibits. It is difficult for an appellate court reviewing the record to ascertain the exact points the witnesses indicated to the trial court, which had the benefit of observing firsthand all of these exhibits and hearing the related testimony.
Kewish is a quadriplegic as a result of the accident. His testimony at the trial was by deposition. Although Kewish was the president of Vulcan, his role within the company was that of an on-site supervisor. Because the Fund asserts that Kewish was present at the site of the injury for personal reasons, some background regarding a dispute between Kewish and the Jefferson County Commission (County) concerning Kewish's property is necessary to understand the controversy in this case.
In 1989, Kewish had a disagreement with the County concerning its proposed sewer line extension. A substantial part of the sewer line would extend directly across Kewish's property near where a dam and pond, the accident site, are located. Kewish refused to sell the property to the County for the sewer line because he disagreed with the proposed route, contending that it would interfere with his plans to build a dam to replace the existing one, a lake, and a residential development on his property. Although the County initiated condemnation proceedings, the parties reached an agreement regarding a major change in the proposed route to accommodate Kewish's plan regarding the lake, the dam, and future development. The sewer line, however, still extended over a portion of Kewish's property.
The County accepted bids for the sewer line project, including an unsuccessful bid from Vulcan. In the process of preparing its bid package, Vulcan dug some "test holes" along the right-of-way of the proposed sewer line site. By way of a letter dated June 12, 1992, the County notified Vulcan that it was not qualified to bid. On July 20, 1992, the successful bidder, Ellard Contracting Company (Ellard) notified Vulcan that it would be entering Kewish's property to commence work on the project. Kewish testified that after receiving this call, and without any request from Ellard, he went to the project site to assure that any test holes dug by Vulcan had been properly filled and were safe to protect Vulcan from any potential liability. He testified that this was a normal procedure in accordance with his job duties. The Fund contends that Kewish's purposes for going to the site were strictly personal; i.e., to protect his interest in his own property surrounding the sewer line project.
Test holes were located on the sewer line easement owned by the County, and approximately 150 feet from the center line of the sewer line easement were Kewish's concrete dam and pond. Kewish testified that he and his wife owned the property on which the dam and pond were located, the property on the other side of the dam, and the property where the test holes were located. Record exhibits indicate that the dam was approximately 80 feet long, 10 feet high, and less than 2 feet wide. One could reach the dam from the sewer line easement only after walking over 130 feet through a wooded area to an embankment where the dam began.
Kewish testified that after inspecting some of the test holes on the project site, he walked through the wooded area to where the dam began and then walked across the dam and down into the dry pond bed. According to Kewish, he returned to the dam and as he stepped onto the dam to cross back over, his foot slipped and he fell. Kewish stated that he did not lose consciousness after his fall, and he admitted that he often searched for arrowheads near test sites. Kewish testified that he did not recall the last time he had been to the dam before his fall, and that he did not believe there were test holes on the other side of the dam. Kewish said he could not recall why he went across the dam or what he did when he got there. The following is Kewish's explanation regarding the location of his accident and the events immediately proceeding it, when questioned *921 by Horace O'Neal, who represented the Fund and Vulcan:
"Q [O'Neal]: But you cannot tell me why you crossed the dam and went about ten feet and turned around and came back across?
"A [Kewish]: No, sir.
"Q [O'Neal]: Or started coming back across?
"A [Kewish]: No, sir, I can't. The only thing I can say is, you know, the dam wasthe pond was dry.
". . . .
"A [Kewish]: It had been drained down, that's the first time I had seen it dry in several years, I'll say. Normally water is running over the dam and you can't walk on it because it's slick. And it was dry the dam was dry and there wasn't any water running over it and I just walked across it and looked, you know, looked at the dry damI mean the dry pond. And then when I came back, I guess my feet were wet and when I stepped on that thing, I may have had mud on my feet because I did get down into the drain section of the lake."
Kewish's nephew, Darrell Bell, found Kewish after his fall. Bell testified that Kewish was conscious, appeared coherent, and appeared to comprehend the seriousness of his accident. Bell testified that he made conversation with Kewish in an effort to keep him calm and awake until help arrived. He testified that Kewish was making random statements, including stating that he was there looking for arrowheads.
James Ellard, the vice president of Ellard, testified that there was no need to dig test holes for this project, that the only test hole he saw was filled, and that test holes posed no risk to his workers because they would be using heavy equipment to move several tons of earth. He also testified that, as a courtesy, his company notified Kewish that Ellard would be entering the property to begin the job. He further testified that Ellard had no plans to perform work on the site where Kewish was injured, and that Ellard had no reason to go near the dam during the construction of the sewer line or the preparation of the project site.
Billy Conn, a Vulcan employee, testified regarding the digging of eight test holes, and he indicated their location on an exhibit. Conn testified that to get to the dam, one must walk through the wooded area, and that performing work around the test holes did not require going down around the dam.
The testimony regarding Kewish's purpose in going to the job site was conflicting. There was testimony that an employee told Kewish to check the holes because Kewish had indicated to that employee that he did not know whether the holes had been filled. Kewish testified that he knew the holes had been filled but was concerned that sinking may have occurred. Kewish further testified that he went to check the holes as part of his normal job duties, to protect Vulcan from liability. Other testimony was that Ellard planned no work in the area of Kewish's injury and that even if tests holes were on the site, they posed no problems or risks in the project. Kewish's wife testified that Kewish had told her he was going to check the holes and "walk the line," a term which she said Kewish himself used; however, she did not indicate what that term meant. Kewish's neighbor testified that Kewish had told her that he had talked to the head of the construction job and that they had come to an agreement about putting a plastic barrier around the work site, and that he was going to the area to oversee that work.
Several reasonable conclusions could be reached from the conflicting testimony regarding Kewish's purpose in going to the site where he was injured. One reasonable view is that Kewish may have gone to the project site merely to check on his own property before any work was begun. Another reasonable conclusion is that Kewish's purpose in going to the project site may have been twofold, i.e., a business purpose and a personal purpose. Another reasonable conclusion is that although Kewish's purpose may have begun as a business purpose, he deviated from the business purpose to carry out a personal objective.
Our review in a workmen's compensation case is a two-step process. This court *922 must initially "look to see if there is any legal evidence to support the trial court's findings. If such evidence is found, then [we determine] whether any reasonable view of that evidence supports the trial court's judgment." Ex parte Eastwood Foods, Inc., 575 So.2d 91, 93 (Ala.1991). Further, if the trial court's judgment is supported by one reasonable view of the evidence, it must be affirmed, "even if another, perhaps better reasoned, view of the evidence might have dictated a different outcome." Ex parte Veazey, 637 So.2d 1348, 1349 (Ala.1993).[1]
Workmen's compensation laws are intended to serve a beneficent purpose and should be liberally construed in favor of the injured employee to accomplish this purpose. See Cement Products Co. v. Martin, 397 So.2d 149 (Ala.Civ.App.1981). The recovery of benefits requires that the employee's injuries be caused by an accident (1) arising out of and (2) in the course of employment. Ala. Code 1975, § 25-5-31. The phrases "arising out of and "in the course of" are not synonymous, and both must be satisfied to bring an injury within the act. Wooten v. Roden, 260 Ala. 606, 71 So.2d 802 (1954). Cases construing these terms should be decided upon their own facts and circumstances, and not by reference to some formula. Moesch v. Baldwin County Electric Membership Corp., 479 So.2d 1271 (Ala.Civ.App.1985). Generally, the phrase "in the course of" refers to the time, place, and circumstances under which the accident took place. Massey v. United States Steel Corp., 264 Ala. 227, 86 So.2d 375 (1955); Gold Kist, Inc. v. Jones, 537 So.2d 39 (Ala.Civ.App.1988); Moesch, supra. The phrase "aris[ing] out of employment involves a causal relationship between the employment and the injury; that is, the job performance was the cause and source of the injury. Massey, supra; Gold Kist, supra. Accordingly, an employee's injury arises in the course of employment "when it occurs within the period of [the employee's] employment, at a place where [the employee] may reasonably be and while [the employee] is reasonably fulfilling the duties of [the employee's] employment or engaged in doing something incident to it." Massey, 264 Ala. at 230; 86 So.2d at 378; see also Moesch, supra. "The rational mind must be able to trace the resulting injury back to a proximate cause set in motion by the employment and not some other agency." Moesch at 1272.
The evidence regarding Kewish's purpose for being at the project site was conflicting. While the Fund contends that Kewish was at the site for strictly personal reasons, Kewish contends that his purpose for going to the site was to check the test holes, which was part of his employment. It is not the province of this court to resolve conflicting ore tenus evidence.
Assuming, arguendo, that Kewish's only purpose in going to the project site was directly related to his employment, the issue then becomes whether Kewish deviated from his employment or that business purpose. When an employee deliberately and substantially steps outside of his employment, this conduct constitutes a substantial deviation from his employment. McKnight v. Consolidated Concrete Co., 279 Ala. 430, 186 So.2d 144 (1966). If an employee is injured while substantially deviating from his employment, the employee's injury is not a compensable injury because the injury does not arise out of and in the course of his employment. McKnight, supra. It is necessary to determine whether the employee's activity so deviated from his business purpose that he went beyond his course of employment by leaving his business purpose to carry out a personal purpose or objective. See Worthington v. Moore Electric Co., 563 So.2d 617 (Ala.Civ. App.1990).
The trial court specifically found that Kewish "had deviated from the course of [his] employment," finding that the accident occurred at a location where Kewish had no reason to be in the course of his employment. The trial court further found that the accident did not occur in "an area [in] which he might have been taking a short-cut from one *923 location to other." Careful and thorough review of the record reveals evidence supporting the trial court's finding in this regard, and at least one reasonable review of that evidence supports the trial court's judgment. Veazey, supra.
Kewish's own testimony indicates that when he crossed the dam he was not fulfilling the duties of his employment, he was not engaging in something incidental to his employment, and there was no business or employment purpose intended. Even if one accepts Kewish's argument that he was performing his job, by his own testimony, it appears that he departed from that purpose when he walked through the wooded area to the dam where he was injured. The record discloses no reason for Kewish to be at the dam in the course of his employment.
Kewish also urges this court to apply the dual purpose or dual capacity doctrine to this case. This argument was also considered and rejected by the trial court. This doctrine applies where the employee is acting with a dual purpose; i.e., the employee's actions involve "`the performance of a service for the employer which would have necessitated a trip by someone if the employee had been unable to perform that service in connection with his personal journey.'" American Automobile Insurance Co. v. Hinote, 498 So.2d 848, 850 (Ala.Civ.App.1986) (citation omitted). If the employer derives a benefit from the employee's actions while acting in a dual capacity, an injury to the employee during the performance of such acts may be found to have arisen out of and in the course of his employment, and thus, be compensable. Hinote, supra. This doctrine is generally applied in cases involving an employee's travel to and from the place of his employment. Regardless, that doctrine is inapplicable here. There is nothing in the record to indicate that Kewish's employer would receive any benefit from Kewish's crossing the dam, and nothing in the record indicates that the employer would have sent someone else across the dam if Kewish had not gone. The evidence is clear that crossing the dam was simply not related to Kewish's employment.
This court recognizes that Kewish has suffered a serious personal tragedy; nevertheless, there is legal evidence supporting the trial court's findings and judgment, and there is a lack of evidence to support Kewish's position. A reasonable view of that evidence requires that the judgment of the trial court be affirmed. Veazey, supra, and Eastwood, supra.
AFFIRMED.
YATES and CRAWLEY, JJ., concur.
ROBERTSON, P.J., and MONROE, J., dissent.
MONROE, Judge, dissenting.
I would reverse the trial court's judgment; therefore, I respectfully dissent.
I believe that the evidence before us shows that the dual purpose or dual capacity doctrine applies to Kewish's trip to the test site as a whole. The doctrine applies when the employee has performed a service for his employer that someone else would have had to perform if the employee had not been able to do it in connection with his personal errand. See American Automobile Insurance Co. v. Hinote, 498 So.2d 848 (Ala.Civ.App. 1986). If the employee is injured while acting in this dual capacity, the injury may be found to have arisen out of the course of the employment and to be compensable, as long as the employer derived a benefit from the employee's actions. Id. The testimony in this case shows that if Kewish was not at the site solely for his employer's business, he was there at least for a dual purpose. His employer benefited from Kewish's inspecting of the test holes, and testimony indicated that this inspecting was a job that someone had to perform for the employer.
That brings us to the problem of Kewish's exact location when the injury occurred. Kewish's injury would not be compensable if he was injured while substantially deviating from his employment. See McKnight v. Consolidated Concrete Co., 279 Ala. 430, 186 So.2d 144 (1966). However, the record gives no indication that Kewish deviated so much as to make his accident uncompensable. "It is well settled that work-connected activity goes beyond the direct services performed *924 for the employer and includes at least some ministration to the personal comfort and human wants of the employee." Gold Kist, Inc. v. Jones, 537 So.2d 39 (Ala.Civ.App.1988).
"Such acts which are necessary to the life, comfort, and convenience of the employee while at work, though strictly personal to himself, and not acts of service are incidental to the service. Therefore, an injury sustained in the performance thereof is deemed to have arisen out of the employment."
Id. (Citation omitted.)
As Kewish correctly argues in his brief to this court, walking slightly away from the premises on a construction site to glance into a dry pond bed is the type of momentary, incidental satisfaction of a human curiosity that would fall within the Gold Kist "personal comfort" doctrine. Such a slight deviation from the course of employment as Kewish made when he looked into the dry pond bed, does not affect compensability. See 1 Arthur Larson, Workmen's Compensation for Occupational Injuries and Death, § 19.63 (1993).
The trial court did not correctly apply the law to the facts. In its judgment, the trial court found that Kewish "had deviated from the course of his employment at the time of the accident which caused his injuries." A mere finding that Kewish had deviated from his employment should not preclude his recovery of workmen's compensation. To preclude recovery, the trial court would have to have found that Kewish substantially deviated from his employment. A slight deviation from employment would not have affected Kewish's recovery.
Finally, the testimony indicated that even if Kewish deviated from his job duties to look into the dry pond bed, he had resumed his duties by the time he was injured. Kewish had stepped back up onto the dam when he slipped. The record reveals that Kewish needed to cross the dam to inspect other test sites.
I believe the only reasonable view of the evidence in this case is that Kewish was entitled to compensation. Therefore, I believe the trial court erred in holding that Kewish was not entitled to compensation. I would reverse.
ROBERTSON, P.J., concurs.
NOTES
[1] The burden of proof and the standard of review of this case are governed by the Workmen's Compensation Act, as it read before the amendments effective August 1, 1992. See Whitsett v. BAMSI, Inc., 652 So.2d 287 (Ala.Civ.App.1994).