**J.B. TAYLOR, Plaintiff,**

v.

**AETNA LIFE INS. CO., Defendant.**

**No. Civ.A. 98–D–634–N.**

United States District Court,
M.D. Alabama,
Northern Division.

April 27, 1999.

G. William Gill, Montgomery, AL, for plaintiff.

Davis Carr, James W. Lampkin, II, Pamela Ann Moore, Mobile, AL, for defendant.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court are Defendant Aetna Life Insurance Company's Motion For Summary Judgment ("Mot."), Memorandum Of Law In Support of Its Motion For Summary Judgment ("Def.'s Br."), and Notice Of Filing Evidence, all filed on January 28, 1999. On February 16, 1999, Plaintiff J.B. Taylor filed a Response In Opposition To Defendant's Motion For Summary Judgment ("Response"). On February 24, 1999, Defendant filed a Reply To Plaintiff's Response In Opposition To The Motion For Summary Judgment ("Reply"). After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendant's Motion For Summary Judgment is due to be granted in part and denied in part.

## JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1332, diversity jurisdiction. The Parties do not contest personal jurisdiction or venue.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no "genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (citing Fed. R.Civ.P. 56(c)). The mechanics of satisfying the initial burden vary, however, depending upon which party, the movant or the nonmovant, bears the burden of proof at trial. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993) (detailing the nature of the parties' responsibilities when preparing or defending against a motion for summary judgment).

Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56(e)). In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## FACTUAL BACKGROUND[1]

Plaintiff was injured on March 14, 1996 at the Maxwell Air Force Base ("Maxwell") commissary. (Resp. at 2.) At the

time of his injury, Plaintiff had two different employers. (*Id.*) Plaintiff was employed by the United States Air Force ("USAF") at Maxwell, working as a Custodial Worker Supervisor at the Officers' Club. (*Id.*; Taylor Dep. at 27; Logan Aff. ¶ 4.) Plaintiff has been an employee of Maxwell since approximately December, 1967, when he was hired as a janitor. (Logan Aff. ¶ 2.)

Plaintiff was also employed, pursuant to a written contract, by Milbrand/Prime Team Services, Inc. ("Milbrand/Prime") as an independent contractor to stock various food product items on the shelves of the Maxwell commissary. (Resp. at 2; Taylor Dep. at 19–20; Taylor Aff. ¶ 2; Def.'s Br. Ex. 5.) Although Plaintiff was employed by the USAF at the Maxwell Officers' Club at the time of his injury, "Plaintiff was not an employee of the [Maxwell] commissary nor was he ever paid by the commissary to perform any work for the commissary." (Resp. at 3; Taylor Aff. ¶ 3.) Further, Plaintiff has never "been under the direction or control of any commissary employees or the commissary management." (Taylor Aff. ¶ 3.)

On March 14, 1996, the date of Plaintiff's injury, "Plaintiff was physically present at the commissary to perform stocking duties" (Resp. at 3) pursuant to his contract with Milbrand/Prime, as demonstrated by the following deposition testimony by Plaintiff:

Q: What else do you stock besides butter?

A: I stock butter, yogurt, cheese.

Q: So dairy products?

A: Yeah, dairy products.

Q: So you would have been there at the commissary on March 14, 1996 to carry out your duties pursuant to this independent contract with Milbrand?

A: Yes.

---

1. The court views the evidence presented on Defendant's Motion For Summary Judgment in the light most favorable to Plaintiff, the

non-moving party. *See Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992).

Q: So you were working for yourself as an independent contractor, correct?

A: Yes.

Q: You were not working for Maxwell?

A: No.

Q: You were not there as part of your duties with the Officers' Club?

A: No.

Q: Your duties with the Officers' Club were confined to the Officers' Club, correct?

A: Right.

(Taylor Dep. at 27.)

However, Plaintiff states that his injury occurred before he began his shelf-stocking duties and that "he was engaged in a purely voluntary undertaking, not for pay, at the behest of commissary employees to assist them in the moving of a refrigeration unit, which unit was dropped on the Plaintiff's hand causing severe crush injuries." (Resp. at 3.) The following deposition testimony by Plaintiff details the events leading up to his injury:

Q: Just before the incident occurred where you were injured, what were you doing?

A: What were [sic] I doing?

Q: Yes, sir.

A: We go to the commissary and we have to put our merchandise on a cart, which we roll out in the store and put on the shelf, so I headed in the cooler to get my merchandise at this particular time.

Q: What happened then?

A: Well, I go in the cooler and one of the commissary QAEs—

Q: What is a QAE?

A: Which it's like a supervisor, per se, commissary manager, you could say. He called me, asked me to give them a hand loading a refrigerator off a pallet.

\* \* \* \* \* \*

Q: So he asked you to come over and help the three of them unload a refrigeration unit?

A: Yeah.

Q: What was it on?

A: A pallet.

Q: I mean, was it on a truck or just on the ground on a pallet?

A: They rolled it out on a pallet jack and sit it down and we was to take it off the pallet to put it in a corner.

Q: So it was down on the ground on a pallet and y'all needed to pick it up and set it off and then they could move it over to wherever they needed to?

A: Right.

Q: What happened then, you went over to help them out?

A: When he—when the commissary officer asked me to help get it off, I went to help them get it off. And I[sic] when I go over to help get it off, as we was getting it off, it slid off on my hand.

\* \* \* \* \* \*

Q: And it pinned your hand to the ground?

A: To the floor.

(Taylor Dep. at 32–35.)

After the injury, Plaintiff went to the emergency room at Montgomery Regional Medical Center ("MRMC"), where he was treated by emergency room doctors. (*Id.* at 37.) The following day, Dr. Jeffery Seitzinger performed surgery to repair Plaintiff's hand. (*Id.*) The History and Physical Report ("H & P Report") prepared by Dr. Seitzinger on March 14, 1996 states that "[t]his patient is a 47 year old black male, right hand dominant, *who was at work at Maxwell Air Force Base* this evening when a metal pallate [sic] crushed his right hand as he was moving this." (Def.'s Br.Ex. 6 (emphasis added).)

Plaintiff filed a workers' compensation claim with Maxwell, one of Plaintiff's two

employers, for medical services rendered by Dr. Seitzinger to Plaintiff. (Logan Aff. ¶ 4.) Thereafter, Kristy Wilson, Personnel Assistant for Maxwell, had a telephone conversation with Plaintiff during which Plaintiff told her that his injury occurred while he was working at a second job at the commissary. (Wilson Aff. ¶ 5.) On May 21, 1996, Norma L. Logan, Human Resources Officer for Maxwell, wrote a letter ("Logan letter") to Dr. Seitzinger in which Maxwell denied Plaintiff's workers' compensation claim because his injury did not occur while working on-site at the Maxwell Officers' Club. (Logan Aff. ¶ 5.) In the letter, Logan gave the following reason for denying Plaintiff's workers' compensation claim:

Our office contacted Mr. Taylor to inquire if he had sustained an injury while on duty. Mr. Taylor stated that he did not obtain the injury while working at the Officers' Club at Maxwell AFB, Alabama. *Mr. Taylor did state that the injury occurred while he was working at his second job.* Since the injury did not occur at the Officers' Club we are not going to be responsible for his medical treatment.

Mr. Taylor was informed by our office that his medical bills should be filed on his private insurance or he should contact his other place of employment where the injury occurred.

(*Id.* Ex. 1 (emphasis added).)

At the time of Plaintiff's injury, Plaintiff was insured under a Preferred Provider Organization Group Health Plan ("Plan") that his employer, the USAF Maxwell, entered into with Defendant. (Resp. at 2 & Ex. 2.) The "General Information About Your Coverage" chapter of the Plan includes a section titled "Type of Coverage," which states in relevant part:

Coverage under this **Plan** is **non-occupational.** Only **non-occupational** accidental **injuries** and **non-occupational**

**diseases** are covered. Any coverage for charges for services and supplies is provided only if they are furnished to a person while covered.

(Plan at 30 (emphasis in original).) The Plan defines "Non–Occupational Injury" as follows:

A non-occupational injury is an accidental bodily injury that does not:

● arise out of (or in the course of) any work for pay or profit; or

● result in any way from an injury which does.

(*Id.* at 38–39.)

On April 9, 1996, Defendant Aetna received Plaintiff's claim for health benefits, seeking payment of medical bills from Hospital Anesthesia and MRMC. (Reeves Aff. ¶ 4.) Thereafter, Janet Reeves, Plan Sponsor Liaison for Aetna, reviewed the relevant records relating to said claim. (*Id.* ¶ 1.) One such record is a copy of Healthline Notes prepared by Colette Alvarado, an Aetna employee, based upon Ms. Alvarado's telephone conversation with Tina, an employee at MRMC. (*Id.* Ex. A.) According to notes made by Alvarado, Tina called Aetna on March 15, 1996 [2] and stated that Plaintiff's H & P Report indicates that "he was injured while working & they are filing as workers comp & not to Aetna." (*Id.*) Accordingly, on April 16, 1996, Aetna denied Plaintiff's claims, listing the following reason on its Explanation of Benefits forms: "YOUR PLAN EXCLUDES SERVICES AND SUPPLIES REQUIRED AS A RESULT OF AN OCCUPATIONAL INJURY. IF WORKERS' COMPENSATION HAS DENIED YOUR CLAIM, PLEASE SEND THE DENIAL TO US." (*Id.* Ex. B (emphasis in original).)

On June 14, 1996, Aetna received renewed claims for benefits submitted on behalf of Plaintiff for his March 14, 1996 injury. (*Id.* ¶ 5.) Shirley Ellis reviewed

---

**2.** The Reeves Affidavit indicates that this telephone conversation occurred on March 18, 1996. The notes of said conversation, however-

er, indicate that the telephone call from Tina to Alvarado occurred on March 15, 1996.

the information submitted to Aetna, which included the aforementioned Logan letter to Dr. Seitzinger. (*Id.*) In her referral review notes, Ellis lists "NOT WORK IN-JURY" as the reason for the renewed claim, but ultimately determines that Plaintiff "hurt himself whiel [sic] working at his second job neverthe less (sic), it is work related and we should deny." (*Id.* Ex. C (emphasis in original).) Accordingly, Aetna denied Plaintiff's claim once again. (*Id.* ¶ 5.) Reeves testified that "Aetna has not received a written request from Mr. Taylor seeking an appeal of its claim determination" and "has not received any information indicating that Mr. Taylor's injury occurred in any manner other than reflected in Aetna's records, i.e., while he was working." (*Id.* ¶ 6.)

On March 5, 1998, Plaintiff filed a two-count Complaint in the Circuit Court of Montgomery County, Alabama in which he demands judgment against Defendant for both compensatory and punitive damages. Specifically, in Count One, Plaintiff claims a breach of contract, asserting that "Defendant breached the said health insurance contract by failing and refusing to pay said medical bills." (Compl.¶ 6.) In Count Two, Plaintiff claims a bad faith breach of insurance contract, asserting that "Defendant failed and refused to pay said medical bills without any legitimate, reasonable and/or arguable basis and in bad faith" and that "[p]rior to refusing to pay said medical expenses, Defendant, in bad faith, intentionally and/or recklessly failed to determine whether it had any legitimate, arguable or justifiable basis to deny paying said medical bills." (*Id.* ¶¶ 10–11.) Defendant removed the case to this court on June 3, 1998, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446 based upon diversity jurisdiction. (Removal Not. ¶ 3.) The court will now address the merits of Defendant's Motion For Summary Judgment.

## DISCUSSION

### I. Breach of Contract

Defendant argues that the court should dismiss Plaintiffs breach of contract claim because Plaintiff's injury is an occupational injury and, therefore, excluded from coverage under the Plan. Specifically, Defendant asserts that Plaintiff "testified that he was injured, in the midst of his performance of his independent contractor duties, assisting Maxwell Commissary employees in moving a refrigeration unit" and that Plaintiff "admits that he advised his treating physician that the injury occurred while he was working at Maxwell." (Def.'s Br. at 3.) In support of said assertions, Defendant references multiple pages of Plaintiff's Deposition, wherein Plaintiff testifies that he was injured while working at his second job and that he informed his treating physician of same:

Q: What did you tell Dr. Seitzinger about how your injury occurred?

A: I told him what happened.

Q: You were at Maxwell, working at Maxwell and it says a metal pallet crushed your right hand as he was moving this. I've got the history and physical ... record from the Montgomery Regional Medical Center [which] reflects that the injury occurred at work.

A: Beg your pardon?

Q: It reflects that the injury occurred at work. You don't dispute that, do you?

PLAINTIFF'S ATTORNEY: Object to the form.

Q: You don't dispute that this injury occurred while you were at the commissary doing a job pursuant to this independent contract?

A: No.

(Taylor Dep. at 41–42.)

Q: And there is no dispute that you were out there to perform the services pursuant to this independent contract that you had with Prime Team—

A: No.

Q: —on the day and at the time the injury occurred?

A: No.

(*Id.* at 70.)

Defendant also argues that Plaintiff admits that he receives compensation for his independent contractor work and had planned to get paid for his work on the day of his injury. (Def.'s Br. at 3.) Defendant further argues that the H & P Report prepared by Dr. Seitzinger indicates that Plaintiff was injured while working at Maxwell. (*Id.*) Additionally, Defendant argues that Plaintiff informed Alvarado of Aetna during a telephone conversation that he had been working at his commissary shelf-stocking job at the time of his injury. (*Id.*) Thus, Defendant argues that "[t]he information provided to Aetna by plaintiff and plaintiff's physician formed the very basis upon which Aetna denied plaintiff's claim—plaintiff was injured while working." (Reply at 4.)

In response to Defendant's arguments, Plaintiff contends that Defendant breached its insurance contract by failing to pay Plaintiff's claim resulting from his non-occupational injury. (Compl. ¶ 6.) Specifically, Plaintiff claims that "at the time of his injury, Plaintiff was engaged in a purely voluntary undertaking, not for pay, at the behest of commissary employees to assist them in the moving of a refrigeration unit ..." (Resp. at 3.) In support of such argument, Plaintiff filed an Affidavit, in which he states:

> At the time I was injured, I was not performing stocking duties for Prime Team Services, Inc. nor was I engaged in any activity related to or incident to my independent contractor stocking duties. Rather, although I was on the premises of the commissary to start those duties, before I actually started to perform those duties, I was asked by a commissary employee if I would help him and other commissary employees move a refrigeration unit because they were having difficulty moving the unit by themselves. I did not have to agree to do so and could have refused. Nor was I paid to help move the refrigeration unit nor was any money offered to me to move the unit. Rather, it was a purely voluntary act on my part to help the commissary employees to move the refrigeration unit. While doing so, the unit dropped on one of my hands causing severe crush injuries to my fingers which I had to have emergency surgery on to repair. And, the company that I had the independent contract with, Prime Team Services, Inc., did not and would not receive anything of benefit from either myself or the commissary for my voluntary undertaking to agree to help commissary employees to move a refrigeration unit. In fact, and as indicated above, I could have refused to help and would not have suffered any adverse or negative action by the commissary, because they had no authority or control over me.

(Taylor Aff. ¶ 4 (emphasis added).) Plaintiff contends that the following testimony from his deposition supports his claim that he was not working at the time of his injury:

Q: And that second job would have been this independent contractor arrangement that you had with Milbrand to stock at the commissary?

A: Yes.

Q: And you don't dispute that that's what you were doing when your injury occurred, do you?

A: Do I dispute that I was—

Q: That you were out there on your second job when the injury occurred.

A: *I was out there on the second job, but I wasn't stocking. I couldn't have been stocking and unload a pallet at the same time.*

(Taylor Dep. at 58–59 (emphasis added).) Accordingly, Plaintiff argues that "[Defendant] Aetna should have paid [his insurance claim] because that occupational thing

that you was (sic) talking about was—I was at the commissary with the intent to make the work, but at this particular time, I was not working." (Taylor Dep. at 75–76.)

At the outset, the court notes that there is no factual dispute between the Parties as to the chain of events leading up to Plaintiff's injury. Rather, the Parties strongly disagree as to whether Plaintiff's participation in the moving of the refrigeration unit "arose out of or in the course of" any work for pay or profit. Specifically, Plaintiff argues that he was not working at the time of his injury, whereas Defendant argues that Plaintiff was working. Accordingly, the court must determine, as a matter of law, whether Plaintiff's injury arose out of or in the course of any work for pay or profit. As discussed below and viewing the facts in the light most favorable to Plaintiff, the court finds that Plaintiff's injury did not arise out of or in the course of any work for pay or profit. Therefore, the court finds that Defendant's Motion For Summary Judgment on Count One is due to be denied.

■ As stated earlier, the Plan defines non-occupational injury as "an accidental bodily injury that does not arise out of or in the course of any work for pay or profit." (Plan at 38.) In determining whether an injury "arises out of or in the course of" work for pay or profit, Alabama's workers' compensation laws provide a clear definition of the "arise out of or in the course of" language, defining said language as follows:

INJURIES BY AN ACCIDENT ARISING OUT OF AND IN THE COURSE OF THE EMPLOYMENT. Without otherwise affecting either the meaning or interpretation of the clause, the clause does not cover workers except while engaged in or about the premises where their services are being performed or where their service requires their presence as a part of service at the time of the accident and during the hours of service as workers.

Ala.Code § 25–5–1(8) (1975). Further, "[t]o determine whether an employee's injuries arose out of his employment, it is only necessary to show that the employment was the cause and the source of the accident." *Cummings Trucking Co. v. Dean,* 628 So.2d 902, 904 (Ala.Civ.App. 1993) (citing *Gold Kist, Inc. v. Jones,* 537 So.2d 39 (Ala.Civ.App.1988); *Massey v. United States Steel Corp.,* 264 Ala. 227, 86 So.2d 375 (1955)). In *Kewish v. Alabama Home Builders Self Insurers Fund,* 664 So.2d 917 (Ala.Civ.App.1995), the court further clarified the analysis as follows:

> Generally, the phrase "in the course of" refers to the time, place, and circumstances under which the accident took place. The phrase "arising out of" employment involves a causal relationship between the employment and the injury; that is, the job performance was the cause and source of the injury. Accordingly, an employee's injury arises in the course of employment when it occurs within the period of the employee's employment, at a place where the employee may reasonably be and while the employee is reasonably fulfilling the duties of the employee's employment or engaged in doing something incident to it.

*Id.* at 922 (citations omitted) (holding that employee deviated from his employment or business purpose at time of accident and was thus not entitled to workers' compensation benefits).

■ "When an employee deliberately and substantially steps outside of his employment, this conduct constitutes a substantial deviation from his employment." *Id.* (citing *McKnight v. Consolidated Concrete Co.,* 279 Ala. 430, 186 So.2d 144 (1966)). Further, "[i]f an employee is injured while substantially deviating from his employment, the employee's injury is not a compensable injury because the injury does not arise out of and in the course of his employment." *Id.* Therefore, "[i]t is necessary to determine whether the employee's activity so deviated from his busi-

ness purpose that he went beyond his course of employment by leaving his business purpose to carry out a personal purpose or objective." *Kewish,* 664 So.2d at 922 (citing *Worthington v. Moore Electric Co.,* 563 So.2d 617 (Ala.Civ.App.1990)).

█ Here, in applying the foregoing body of law to the facts, the court finds that Plaintiff's injury did not arise out of or in the course of his second job as a shelf-stocker at the commissary. While it is true that Plaintiff was physically present at the commissary to perform his job responsibilities of his second job and had even begun preparing his cart with shelf-stocking items, the court determines that the circumstances under which the accident took place did not arise out of Plaintiff's shelf-stocking job. Specifically, the requisite causal relationship between Plaintiff's job and his injury is not present in this case because Plaintiff's job performance was not the cause and source of his injury. Plaintiff, in agreeing to assist the commissary workers in moving the refrigeration unit, deviated from the scope of his employment as a shelf-stocker. Indeed, Plaintiff deliberately and substantially stepped outside of his employment by volunteering to assist the commissary employees.

Thus, the court finds that: no employment relationship existed between the Plaintiff and the Maxwell AFB commissary; Plaintiff never received any payment or compensation from the commissary; Plaintiff was neither paid nor offered to be paid by the commissary at the time of his injury for helping with the moving of a refrigeration unit; Plaintiff was not subject to any direction, control, or authority by any commissary employees; Plaintiff's undertaking was one that was purely voluntary; and Plaintiff's actions did not benefit Milbrand/Prime, his second employer.

Accordingly, the court finds that Plaintiff's injury did not arise out of or in the course of any work for pay or profit because said injury did not occur while Plaintiff was working his second job as a shelf-

stocker. Therefore, the court finds that Defendant's Motion For Summary Judgment on Count One (breach of contract) is due to be denied.

## II. Bad Faith Breach of Insurance Contract

Defendant argues that "there is no evidence of a conscious intent on Aetna's part to injure the plaintiff" (Def.'s Br. at 10) and that "Aetna's decision to deny plaintiff's claim was based on a reasonable, debatable, arguable and legitimate reason—the Plan did not cover occupational injuries." (*Id.* at 11.) Defendant further argues that its denial of Plaintiff's claim was not made in bad faith because "the only information it had been provided at the time [was] that plaintiff was working at the time he was injured." (Reply at 6.) Finally, Defendant argues that "Plaintiff does not dispute that the only information provided to Aetna with regard to his injury was that he was working at the time of his injury...." (*Id.* at 5.)

Specifically, Defendant offers the following deposition testimony of Plaintiff in support of its argument:

Q: ... I've seen Aetna's records.... It reflects that the information that Aetna received was that this injury occurred as a result of you engaging in some type of work. And do you have any documents that you contend were submitted to Aetna that showed that it didn't arise out of any type of work?

A: No.

Q: Have you ever written a letter to Aetna saying, wait a minute, you know, this didn't arise out of my work—

A: No.

Q:—or articulating the position that because you walked away from loading up your cart to help out with moving the refrigeration unit that you stepped out of your

position of being employed as a vendor stocker in that contract and you stepped away from that from the time you were helping move this refrigeration unit?

A: Did I—

Q: Did you send anything to Aetna about that?

A: No.

Q: Did you communicate that in any way to Aetna?

A: No.

Q: And you never yourself sat down and wrote a letter to Aetna saying, I want you to review this claim, here's what happened; I don't think that—I think it should be covered because here's what happened?

A: No.

(Taylor Dep. at 67–69.) Additionally, the following deposition testimony also supports Defendant's claim that it had no reason to believe that Plaintiff's injury was non-occupational:

Q: So your position is that because you stepped away from doing this— loading your cart and you walked over here to help out lifting this [refrigeration unit], you weren't working at this time? Is that your position?

A: Right.

Q: And you never conveyed that information to Aetna, did you?

A: No.

Q: So Aetna didn't have the benefit of the facts of you walking away from doing this independent contract before I came in here today and you told me in this deposition? You didn't tell them when you filed this claim, correct?

A: No.

Q: You just told me you didn't.

A: No.

Q: And you didn't tell them at any other time until we came in here today?

A: No.

Q: And you didn't write a letter—

A: No.

Q:—to Aetna saying anything about this?

A: No.

Q: And you can't dispute that the only information that Aetna had before it at the time that it decided your claim was that you were injured while at work? You can't dispute that, can you?

A: No, I can't dispute that.

(Taylor Dep. at 76–77.)

Thus, Defendant argues that Plaintiff admits that he never provided Aetna, neither at the time of his initial claim nor at the time of his renewed claims, with any information tending to demonstrate to Aetna that Plaintiff was not working at the time of his injury and that, therefore, said injury was non-occupational. (Reply at 6.) Aetna argues that it "was not aware of plaintiff's position that he was not working at the time of his injury until plaintiff's deposition, which was recently conducted on January 19, 1999." (*Id.*) Defendant claims that not until reading Plaintiff's Affidavit, submitted as part of Plaintiff's Response to the instant Motion For Summary Judgment, filed on February 16, 1999, did Defendant receive any written information tending to demonstrate that Plaintiff was not working at the time of his injury. (*Id.*)

■ The Alabama Supreme Court recently addressed the theories by which a plaintiff may establish a bad-faith refusal to pay an insurance claim, stating that:

A plaintiff can establish a bad-faith refusal to pay an insurance claim by two theories:

(1) that the insurer had no lawful basis for the refusal to pay the claim and knew that it had no lawful basis, or

(2) that the insurer intentionally failed to determine whether there was any lawful basis for refusing to pay.

*State Farm Fire & Cas. Co. v. Slade,* Nos. 1961769 & 1961770, 1999 WL 64960, at *10, —— So.2d —— (Ala. Feb.12, 1999) (citing *Chavers v. National Sec. Fire & Cas. Co.,* 405 So.2d 1, 7 (Ala.1981)). Furthermore, to establish one of the two theories, a plaintiff must demonstrate the following requirements:

(a) an insurance contract between the parties and a breach thereof by the defendant;

(b) an intentional refusal to pay the insured's claim;

(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;

(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*Slade,* 1999 WL 64960, at *10, —— So.2d at —— (citing *National Sec. Fire & Cas. Co. v. Bowen,* 417 So.2d 179, 183 (Ala.1982)).

■ The Alabama Supreme Court has interpreted these requirements as follows:

In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.

The "debatable reason" under (c) above means an arguable reason, one that is open to dispute or question.

*Bowen,* 417 So.2d at 183. Additionally, the Alabama Supreme Court "has made it abundantly clear that an action for bad faith lies only where the insurer has acted with an intent to injure." *Webb v. International Indem. Co.,* 599 So.2d 1144, 1146 (Ala.1992) (citing *Coleman v. Gulf Life Ins. Co.,* 514 So.2d 944, 946 (Ala.1987) (citing *Blue Cross & Blue Shield v. Granger,* 461 So.2d 1320, 1327 (Ala.1984))).

The court notes that, despite the existence of said theories and Defendant's analysis of same, Plaintiff fails to mention or discuss these theories in its Response. Indeed, Plaintiff's sole argument in support of his bad faith claim is that "an ambiguity exists as to whether the [non-occupational coverage limitation] language of the policy ... can validly limit the health insurance coverage available to the Plaintiff under the plan." (Resp. at 13.) Specifically, Plaintiff does not dispute the existence of the non-occupational coverage limitation set forth in the "Type of Coverage" section of the Plan's "General Information About Your Coverage" chapter. (*Id.*) Rather, Plaintiff argues that, because the non-occupational coverage limitation relied upon by Defendant does not appear in either the Plan's "Summary of Coverage" pamphlet issued with the Plan booklet or in the "General Exclusions" section of the Plan's "Health Expense Coverage" chapter, said limitation is ambiguous.[3] (*Id.*)

Plaintiff then argues that "an insurer cannot rely on an [insurance policy] ambiguity as the basis for denying payment of a claim." (*Id.*) In support of this argument, Plaintiff cites *Blackburn v. Fidelity & Deposit Co. of Md.,* 667 So.2d 661 (Ala. 1995) and *Employees' Benefit Ass'n v. Grissett,* 732 So.2d 968 (Ala.1998) as standing for the proposition that "a bad faith claim may be predicated upon an insurers

3. Plaintiff also argues that "under the 'Limitations' provisions contained on page 4 of the [ ] [Plan], there is no reference to an exclusion or limitation for occupational injury ..." (Resp. at 7.) The court finds no ambiguity in

the fact that a limitations section specifically dealing with prescription drugs, as does this section, contains no reference to a limitation or exclusion for occupational injuries.

[sic] improper reliance of [sic] an ambiguity in an exclusion as the basis for denying payment of an insurance claim." (Resp. at 13.).

In its Reply, Defendant argues that there is no ambiguity as to the enforceability of the provision in its Plan which excludes coverage for occupational injuries. (Reply at 1.) Defendant argues that:

> Plaintiff's reliance on the fact that the summary of coverage document does not indicate that occupational injuries are not covered is misplaced. The summary of coverage is obviously not the Plan, and the summary itself in fact refers the employee to the Plan for more information about various Plan provisions and indicates that the summary should be kept along with the Plan booklet.

(*Id.* at 2.) Defendant argues that an insurance policy must be interpreted from its four corners, *see Hill v. Ocean–Accident & Guar. Corp.,* 230 Ala. 590, 162 So. 376, 377 (1935), and that it is necessary to give both effect and a reasonable interpretation to all parts and provisions of said policy. *See Smith v. Kennesaw Life & Accident Ins. Co.,* 284 Ala. 12, 221 So.2d 372, 377 (1969); *Metropolitan Life Ins. Co. v. Korneghy,* 37 Ala.App. 497, 71 So.2d 292, 296 (1954).

In setting forth rules for the interpretation of insurance policies:

> The Supreme Court of Alabama has consistently held that "insurance companies are entitled to have their policy contracts enforced as written...." *Gregory v. Western World Ins. Co.,* 481 So.2d 878, 881 (Ala.1985). They need not risk their terms to judicial interpretation or to strained constructions. *See id.* In other words, the provisions of an insurance policy must be given their ordinary, common meaning. *See Taber v. Nationwide Mut. Ins. Co.,* 447 So.2d 698, 700 (Ala.1984) ("It is the duty of the courts to take the words of an insurance policy as they are found in it, and as persons with usual and ordinary understanding would construe them when used to express the purpose for which they were

employed") (quoting *Green v. Merrill* [ 293 Ala. 628,] 308 So.2d 702, 704 (Ala. 1975)). The courts must give policy language "the meaning which would be attached by an ordinary person of average understanding if purchasing insurance. An insurance policy should be read as a layman would read it and not as it might be analyzed by an attorney or insurance expert." *Liggans R.V. Ctr. v. John Deere Ins. Co.,* 575 So.2d 567, 571 (Ala. 1991) (quoting 13 Appleman, Insurance Law and Practice § 7384 (1976)).

*Allstate Ins. Co. v. Sellers–Bok,* 942 F.Supp. 1428, 1433 (M.D.Ala.1996). Further, the Supreme Court has held that an insurance policy must not be construed in isolation, but rather, must be construed as a whole, looking to the language within its four corners. *Liggans,* 575 So.2d at 569.

Insurance policy "language is ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time." *Canal Ins. Co. v. Old Republic Ins. Co.,* 718 So.2d 8, 12 (Ala.1998) (citing *Zitterow v. Nationwide Mut. Ins. Co.,* 669 So.2d 109, 112 (Ala.1995)). Where ambiguity exists in the language of an insurance policy, said language must be construed in favor of the insured. *See Blackburn,* 667 So.2d at 669; *see also State Farm Fire & Cas. Co. v. Sexton & Sexton, Inc.,* 985 F.Supp. 1336, 1339 (M.D.Ala.1997) (DeMent, J.) (stating that "[i]f an insurance policy is ambiguous in its terms, the policy must be construed liberally in favor of the insured, and exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage to the insured").

> Where there is any doubt or confusion as to the meaning of a term in an insurance policy, the general rule of contracts applies to the policy, so that the contract is interpreted against the party which drafted the contract. *Home Indemnity Co. v. Employers Nat'l Ins. Corp.,* 564 So.2d 945 (Ala.1990). Any language of an insurance contract that is susceptible

to more than one interpretation must be construed in favor of coverage for the insured. *St. Paul Fire & Marine Ins. Co. v. Edge Memorial Hosp.*, 584 So.2d 1316, 1322 (Ala.1991) (citing *National Union Fire Ins. Co. v. Leeds*, 530 So.2d 205, 207 (Ala.1988)).

*United Servs. Auto. Ass'n v. Vogel*, 733 So.2d 401, 403 (Ala.Civ.App.1998) (citing *Boone v. Safeway Ins. Co. of Ala.*, 690 So.2d 404, 406 (Ala.Civ.App.1997)).

 However, "[w]hile limitations on coverage are to be interpreted as narrowly as possible so as to provide the maximum allowable coverage to the insured, parties' conflicting constructions of otherwise unambiguous policy language do not necessarily render the disputed language ambiguous." *Canal*, 718 So.2d at 12 (citations omitted). Further, "[c]ourts may not rewrite the terms of a policy or interpret unambiguous policy language so as to provide coverage that was not intended by the parties." *Id.* (citing *Altiere v. Blue Cross & Blue Shield of Ala.*, 551 So.2d 290 (Ala. 1989)).

 Here, while Plaintiff properly cites *Blackburn* and *Grissett* as standing for the proposition that a plaintiff's bad faith claim may be based upon defendant's improper reliance on an insurance policy ambiguity, the court finds that there is nothing ambiguous about the non-occupational coverage limitation in the Plan. On the contrary, the court finds that the language of the Plan makes it entirely clear that the Plan offers coverage for non-occupational injuries, but not for occupational injuries. Indeed, as already stated, the "Glossary" chapter of the Plan clearly defines non-occupational injury. The court further finds that Plaintiff's allegations of improper placement by Defendant of the non-occupational coverage limitation within the body of the insurance policy are without merit. Said placement by Defendant does not meet the definition of ambiguous because, regardless of the location of the non-occupational coverage limitation, the court does not find that the language of

said provision can be understood in more than one way or that such language refers to two or more things at the same time. *See Canal*, 718 So.2d at 12.

The court, having just determined that Plaintiff's ambiguity argument is without merit, now returns to its discussion of the theories by which a plaintiff may establish a bad-faith refusal to pay an insurance claim. In analyzing the requirements which must be demonstrated by Plaintiff to establish a bad-faith refusal to pay by Defendant and applying same to the facts in the instant case, the court finds that said facts do not establish bad faith on the part of Defendant.

Specifically, the court concludes that Plaintiff has established neither of the two theories available to demonstrate Defendant's bad-faith denial. Proof of the first theory, which states "that the insurer had no lawful basis for the refusal to pay the claim and knew that it had no lawful bases," requires proof of the first four requirements, (a) through (d). *See Slade*, 1999 WL 64960, at *10, —— So.2d at ——. The facts, coupled with the court's determination that Defendant breached its contract with Plaintiff, satisfy requirements (a) and (b) by demonstrating that an insurance contract between the Parties existed and was breached by Defendant, who intentionally refused to pay the insured's claim. Requirements (c) and (d), however, have not been demonstrated because Defendant had a legitimate, arguable, and debatable reason for denying Plaintiff's claim. Specifically, the court notes Defendant's argument and Plaintiff's admission that the only information that Defendant had before it at the time it denied Plaintiff's claim was that Plaintiff was injured while at work. (Taylor Dep. at 76–77.) Defendant further argues and Plaintiff does not dispute that Defendant was not aware of Plaintiff's theory, that his injury was non-occupational, until the time of Plaintiff's Deposition on January 19, 1999, conducted long after Defendant refused to pay Plaintiff's claims. (Reply at 6.) Ac-

cordingly, the court finds that Defendant was unaware at the time it denied Plaintiff's claim that Plaintiff was claiming that his injury was non-occupational and, therefore, finds that Plaintiff has failed to establish the first theory.

Proof of the second theory, which states "that the insurer intentionally failed to determine whether there was any lawful basis for refusing to pay," requires proof of the fifth element, (e). *See Slade,* 1999 WL 64960, at *10, —— So.2d at ——. This bad-faith scenario deals with the case where a plaintiff claims that defendant insurance company failed to properly investigate his or her health insurance claim. *Id.* at *11, —— So.2d at ——. In the instant case, however, Plaintiff never alleges that Defendant failed to investigate his claim and the court, therefore, need not address this theory.[4] Accordingly, the court finds that Plaintiff has failed to establish the second theory.

Therefore, the court finds that Defendant's denial to pay Plaintiff's health insurance claim was not a bad-faith refusal. Accordingly, the court finds that Defendant's Motion For Summary Judgment on Count Two is due to be granted and that Count Two of Plaintiff's Complaint is due to be dismissed.

### ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendant's Motion For Summary Judgment be and the same is hereby DENIED IN PART and GRANTED IN PART as follows:

1. DENIED with respect to Count One, Breach of Contract, of Plaintiff's Complaint; and

2. GRANTED with respect to Count Two, Bad Faith Breach of Insurance Contract, of Plaintiff's Complaint.

3. Therefore, Count Two of Plaintiff's Complaint is hereby DISMISSED.

The Clerk of Court is DIRECTED to transmit a copy of this Order to the Parties via facsimile and United States Mail.

---

4. Fed.R.Civ.P. 56(e) states in relevant part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
Fed.R.Civ.P. 56(e).